John MEYERS, Plaintiff–Appellee, Cross–Appellant,

v.

CITY OF CINCINNATI; Scott Johnson, Individually and as City Manager; David Rager, Individually and as Assistant Director of Safety, Defendants–Appellants, Cross–Appellees.

Nos. 90–3096, 90–3154.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 7, 1991.

Decided June 7, 1991.

prevents a person from qualifying as a disinterested person.

William S. Wyler, (argued) and Donald B. Hordes, Schwartz, Manes & Ruby, Cincinnati, Ohio, for plaintiff-appellee cross-appellant.

Richard H. Castellini, Kim Wilson Burke, and James F. McCarthy, III, argued, City Solicitor's Office, for the City of Cincinnati, Cincinnati, Ohio, for defendants-appellants cross-appellees.

Before MERRITT, Chief Judge, and RYAN and SUHRHEINRICH, Circuit Judges.

MERRITT, Chief Judge.

The fire chief of the City of Cincinnati instructed the plaintiff, the assistant fire chief in charge of personnel, to conduct an investigation of the distribution of "unauthorized literature" to potential recruits of the fire department. In connection with his investigation, plaintiff contacted two influential citizens who interpreted his questions and statements to be criticism of affirmative action. As a result, they brought pressure to bear on city officials who engaged in conduct which plaintiff claims coerced his retirement and constituted a "constructive discharge." The primary questions before us in this action under 42 U.S.C. § 1983 are whether the city and two of its officials discharged plaintiff or otherwise denied him employment in violation of the Free Speech Clause of the First Amendment and whether plaintiff was denied pre- or post-termination hearings in violation of the Due Process Clause.

The district court held on summary judgment (a) that plaintiff's retirement was forced and was tantamount to a discharge; (b) that he was entitled to a post-termination hearing and that the refusal to give him such a hearing was a denial of due process; and (c) that defendants did not abridge plaintiff's right of free speech, 728 F.Supp. 477. We affirm in part and reverse in part.

## I. FACTS

On December 7, 1987, Fire Chief Wells ordered plaintiff to investigate complaints that "literature" had been handed out to potential minority and female recruits during a sign-up for a new fire recruit class. The "literature" turned out to be a business card for PREP, Inc. To determine what PREP was and why it would be handing out cards at a recruitment sign-up, plaintiff called PREP and talked first with Daisy Foster and later with Lucy Green. They told him that PREP is funded by the Department of Labor and assists minorities in competing for jobs. The City takes the position that during these calls plaintiff told Green and Foster that he thought it was improper for PREP, Inc. to help people pass the civil service exams when they could not then do a good job. Plaintiff denies that he made these statements. Plaintiff reported his findings concerning PREP's functions and intention to the fire chief and concluded the investigation when instructed to do so.

Foster and Green took offense at plaintiff's phone calls and what they perceived as criticism of their efforts to help minorities pass the fire department exams. Green called defendant Rager and members of the City Council to complain about the calls. Rager is Assistant Director of Safety for the City of Cincinnati and has supervisory authority over the fire division. After the call from Green, Rager called Chief Wells and told him to investigate plaintiff's conduct of the investigation. Chief Wells talked with Foster, Green and plaintiff about plaintiff's calls to PREP.

When Wells arrived at PREP's office to talk with Lucy Green about plaintiff, he was surprised to find that Rager was present at Green's request. Foster and Green reported to Wells that plaintiff's statements and attitude were objectionable. Wells concluded in his report that the two overreacted and that plaintiff had generally behaved properly. Wells reported to Rager that "no one really did anything wrong, i.e., violated the law, violated City policy, violated Fire Division Rules or violated anyone's constitutional rights," and recommended against disciplinary action.

Rager, supported by the Director of Public Safety, Michael Bierman, ordered Wells to file charges against plaintiff. Rager and Bierman reviewed the charges and approved them. At their instruction, Wells called plaintiff into his office and gave him three choices: he could resign or take a demotion to District Fire Chief and not face charges, or if he did neither, charges would be filed against him. Plaintiff asked to see the charges but was told he could not see them until he had made a decision. He declined to resign or accept demotion and the charges were filed.

The charges stated that in his telephone conversations with Foster and Green plaintiff expressed concern that PREP was "preparing people to take the test who then can't do the job" and was perceived as being rude, not objective and racist.

A hearing on the charges was held. Rager presided as hearing officer, although the city's handbook on hearings states that the charging officer should not be the hearing officer. Plaintiff's lawyer was not allowed to question Chief Wells about the substance of the charges. No evidence was presented by the city except Wells' report of his interviews with Foster and Green. Rager recommended that plaintiff be fired. The personnel department objected that the penalty was too harsh and suggested three alternative forms of discipline. Rager then recommended the most severe of those, a demotion to district chief. Defendant Scott Johnson, the city manager, accepted the recommendation and implemented the penalty.

As a thirty-year veteran of the fire division, plaintiff had accumulated substantial retirement benefits as assistant chief which would be lost if his rank were reduced. He concluded that he could not afford the demotion, and informed Chief Wells that he would retire rather than accept demotion. He then petitioned the municipal civil service commission for review of Rager's conduct of the investigation and hearing. The commission declined to review the procedure on the grounds that plaintiff had voluntarily retired and was not entitled to a hearing.

Instead of seeking review in the state courts of Ohio under state statutes providing for such review, plaintiff filed suit in the United States District Court for the Southern District of Ohio against the City of Cincinnati, Rager and Johnson and sought a jury trial. Rager and Johnson are named individually and in their official capacities. Included in plaintiff's complaint were allegations of denial of both procedural due process and First Amendment rights to free speech, as incorporated in the Due Process Clause of the Fourteenth Amendment, and race discrimination in violation of the Equal Protection Clause. After discovery, plaintiff and defendants filed cross motions for summary judgment on all issues, and the district court granted summary judgment on all issues. The district court held that plaintiff's resignation was coerced by the defendants, and thus constituted a constructive discharge. On the procedural due process claim, the court held that the pre-termination hearing was constitutionally sufficient, but that plaintiff was improperly denied a post-termination hearing. The court ordered the plaintiff reinstated until such time as he is granted a post-termination hearing. The defendants appeal this order. On all other issues the district court held for the defendants. It found that plaintiff's speech did not involve a matter of public concern and thus was not protected. It held that defendants had not engaged in racial discrimination because their actions were not taken due to plaintiff's race. Plaintiff appeals these determinations.

## II. FIRST AMENDMENT CLAIM

■ Plaintiff's appeal asks us to determine whether the city's action against him was motivated by his speech and whether that speech is protected speech. If both questions are answered affirmatively, plaintiff's First Amendment right to free speech has been denied. In making these determinations, we must review the whole record to assure that "the judgment does not constitute a forbidden intrusion on the

field of free expression." *Rankin v. McPherson*, 483 U.S. 378, 386 n. 9, 107 S.Ct. 2891, 2898 n. 9, 97 L.Ed.2d 315 (1987). The ultimate question of whether speech is protected is a matter of law. *Id.; see also Connick v. Myers*, 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 1690 n. 7, 75 L.Ed.2d 708 (1983).

The motivation behind the city's disciplinary action is a question of fact, *Langford v. Lane*, 921 F.2d 677, 680 (6th Cir.1991), but the record before us leaves no room for reasonable minds to differ. It was the objection of Foster and Green to the content of plaintiff's alleged statements on the telephone that moved Rager to act as he did. As in *Ratliff v. Wellington Exempted Village Schools Bd. of Educ.*, 820 F.2d 792 (6th Cir.1987), the change in the attitudes and actions of the defendants before and after the speech in question is too compelling to ignore. Prior to the calls to PREP, no action had ever been taken against the plaintiff in his more than 30 years with the Fire Division. There was no existing dispute between the plaintiff and Chief Wells or Rager at the time of the calls. *Compare Ratliff,* and *Rankin,* (no dispute between employer and employee prior to speech) *with Connick* and *Mount Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (plaintiffs' speech concerns previously existing dispute between employer and employee). The city manager stated that although he did not know precisely what plaintiff said, plaintiff's statements were in direct contravention of city policy on affirmative action. He determined that plaintiff had taken "actions" perceived by the public as being anti-affirmative action. But the "actions" consist only of the statements made to Foster and Green. The city has offered no credible evidence that the discipline would have taken place in the absence of the alleged statements. Under *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), without such evidence summary judgment is proper on the issue of whether the city would have acted against the plaintiff in the absence of his speech to Foster and Green.

▮ Under the current somewhat imprecise standard, speech of a public employee is protected if (1) the speech addresses a matter of public concern, and (2) the employer has no overriding state interest in efficient public service that would be undermined by the speech. *Rankin*, 483 U.S. at 384, 107 S.Ct. at 2896; *Connick*, 461 U.S. at 146–150, 103 S.Ct. at 1689–92; *Mount Healthy*, 429 U.S. at 283–284, 97 S.Ct. at 574–575 (1977); *Pickering v. Board of Educ. of Township High School Dist.* 205, *Will County, Illinois*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Langford*, 921 F.2d at 680. Application of this standard raises a question of law. *Rankin*, 483 U.S. at 386 n. 9, 107 S.Ct. at 2898 n. 9; *Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7.

This case is analogous to *Rankin*, not *Connick*. In *Connick* permissible employment action was taken as a result of an internal office dispute about a transfer, and the speech was concerned only with internal office policy. In *Rankin* the employee had no dispute with her employer until she stated at work that if a second attempt were made on the President's life she hoped it would be successful. The court held that in context the speech addressed the employee's dissatisfaction with the President's cuts in Medicaid, CETA and welfare benefits. The Court said that "conversation addressing the policies of the President's administration ... [made] on the heels of a news bulletin regarding what is certainly a matter of heightened public attention: an attempt on the life of the President," is plainly a matter of public concern. *Rankin*, 483 U.S. at 386, 107 S.Ct. at 2898. The speech scrutinized in *Rankin* was in the form of an opinion, made in a private conversation later reported to the employee's superior.

In the instant case, plaintiff's speech is on a matter of public concern. The record discloses no prior internal office disagreements between plaintiff and his superiors. City Manager Johnson's statements concerning city policy regarding affirmative action make clear that he believed the subject to be a matter of general public concern. The city's suggestion that the statement is not protected because it was

2

**730**

couched as opinion over the telephone rather than in a public forum was rejected in *Rankin.* *Id.* at n. 11. The charges against the plaintiff refer to an affirmative action lawsuit brought against the City of Cincinnati and the consent decree stemming from that suit as a reason for the city's affirmative action policy. A newspaper published a story about the investigation of plaintiff's statements concerning affirmative action. City Council members called the Director of Public Safety concerning the comment. Defendant Rager expressed a need to remove plaintiff from the "limelight." Just as an opinion concerning the general policy of affirmative action would be a matter of public concern, so too is speech concerning methods of implementing affirmative action. Under the facts of this case, speech about a politically charged issue like affirmative action—whether pro or con— should be considered a matter of public concern.

We now turn to the second step of the Supreme Court's test in which we compare the employee's right to speak with the public employer's need to run an efficient organization. *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734. In order to justify a restriction on speech of public concern by a public employee, plaintiff's speech must impair discipline by superiors, have a detrimental impact on close working relationships, undermine a legitimate goal or mission of the employer, impede the performance of the speaker's duties, or impair harmony among co-workers. The state bears the burden of showing a legitimate justification for discipline. *Rankin*, 483 U.S. at 388, 107 S.Ct. at 2899; *Pickering*, 391 U.S. at 570–573, 88 S.Ct. at 1735–1737. As in *Rankin*, we look for evidence of the impact of the statement on the city's legitimate organizational interests. 483 U.S. at 388, 107 S.Ct. at 2899.

The record indicates that plaintiff made a controversial statement regarding the means of accomplishing affirmative action to two citizens whose perspective and mission caused them to react with hostility.

The city offered no evidence of any adverse effect upon plaintiff's relationship with his co-workers, nor of any adverse impact upon the City's affirmative action program except for the anger the speech in question raised in Green and Foster. There was no evidence that the City's ability to provide firefighting services was undermined, nor evidence that plaintiff could not command the respect of his minority or non-minority subordinates. The record is barren of any credible explanation for Rager's conduct other than his desire to show that city officials agreed with the political philosophy on affirmative action of the two influential citizens.

It is true that the city manager testified about potential damage which Meyers' "action" might have on the city's affirmative action policy, but he acknowledged that he had no information on the subject other than the conclusory report written by Rager after the hearing. There was no evidence presented at that hearing to support those conclusions. There is no record of any evidence except the affidavits of two other assistant fire chiefs who said that the close working relationships within the fire division were not affected, and that there was no activity on the part of black or white firefighters which suggested concern with the department's affirmative action program as a result of plaintiff's phone call. The evidence is straightforward: Daisy Foster, Lucy Green, and thereafter David Rager did not like what they understood plaintiff to say. That falls well short of a showing of a legitimate interest which would allow the city to limit plaintiff's First Amendment rights in free speech on a controversial political issue.

Since there is no evidence of any city interest which would permit the limitation of the speech in question here, we hold that plaintiff's speech is protected under the First Amendment. Having previously found that the city's determination to demote the plaintiff was motivated by plaintiff's speech, we hold that the city acted to deny plaintiff his First Amendment rights in free speech. The District Court erred in its conclusion to the contrary, and we reverse and remand for further proceedings.

### III. PROCEDURAL DUE PROCESS CLAIMS

The plaintiff asserts, and the District Court agreed, that his due process

rights were violated when the defendants forced his retirement without an adequate post-termination hearing as required by Ohio law. Ohio Rev.Code Ann. § 124.34 (Baldwin 1987). It is true that the municipal civil service commission refused to allow plaintiff to be heard because it interpreted the plaintiff's retirement as voluntary, but this refusal does not constitute a due process violation because an adequate state corrective judicial process exists. As we explained in *Vicory v. Walton*, 721 F.2d 1062 (6th Cir.1983), *cert. denied*, 469 U.S. 834, 105 S.Ct. 125, 83 L.Ed.2d 67 (1984): "In a procedural due process case under section 1983, the plaintiff must attack the state's corrective procedure as well as the substantive wrong." *Id.* at 1066. The plaintiff here has attacked the municipal administrative hearing process, but he has not attacked the state's judicial process for the correction of errors by administrative agencies. In fact the state's judicial review process allows full review of such administrative decisions. *Kinney v. Ohio State Dept. of Admin. Serv.*, 14 Ohio App.3rd 33, 469 N.E.2d 1007 (1984), is a case in point. That court found invalid a forced retirement and reversed the action of the court of common pleas which had sustained the civil service commission.[1] It is clear from *Kinney* that the state has a complete judicial corrective process fully adequate to review the plaintiff's claims. Therefore, the plaintiff has not shown a procedural due process violation.

Plaintiff also claims as a matter of procedural due process that the "right-of-reply" hearing officer should have been unbiased, a requirement not supported by *Duchesne v. Williams*, 849 F.2d 1004 (6th Cir.1988)

(*en banc*), cert. denied 489 U.S. 1081, 109 S.Ct. 1535, 103 L.Ed.2d 840 (1989). No claim is made on appeal that the hearing officer should have been replaced for reasons other than bias.

■ Moreover, we have been referred to no positive law of the State or City, no state statute or city ordinance, providing for a pretermination hearing. Apparently in certain instances as a matter of custom, some departments of the City allow a pretermination hearing before the imposition of discipline; but in the absence of some positive law, we do not read such a custom as a part of the bundle of rights which constitute a "property right" in employment. Thus we find no independent basis in state law for imposing a requirement for a pretermination hearing, and we find no basis in federal law for any pretermination hearing other than the "right of reply" hearing described in *Duchesne*. *Id.* The cases of *Zinermon v. Burch*, 494 U.S. 113, 110 S.Ct. 975, 984–85, 108 L.Ed.2d 100 (1990), and *Watts v. Burkhart*, 854 F.2d 839 (6th Cir.1988), are not helpful to the plaintiff because in *Zinermon* the Court held in a hospital commitment case that the due process clause itself, as in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), created the need for a pre-termination hearing and in *Watts* the Court held that state law created the right as a part of state law. The instant case does not fall into either of these two categories in which a pre-deprivation hearing is required.

## IV. OTHER ISSUES

The plaintiff's racial discrimination claim that he was forced to retire because he is

1. As Judge Norris, now a member of this Court, said in the course of his opinion for the Ohio Court of Appeals:

Here, the uncontroverted facts reveal a sorry pattern of heavy-handed, churlish conduct on the part of the appointing authority in inducing appellant to submit his resignation. The department's peevish protestations that its pressure tactics are to be overlooked because it corrected its misstatements concerning appellant's retirement benefits, pale when compared with the totality of the circumstances, including hours of unwarranted constraint and pressure, created by the department. It is

precisely this kind of reprehensible conduct, devoid of subtlety or decency, which our civil service laws are designed to prevent; and against which the board is charged to protect public employees.

When a resignation is the product of the appointing authority's wrongful overt acts of coercion and duress, it is involuntary and ineffective. Accordingly the court of common pleas abused its discretion when it concluded that the board's decision was supported by reliable, probative, and substantial evidence.

14 Ohio App.3d at 35–36, 469 N.E.2d at 1009–10.

**732**

white is not supported by any facts in the record, as the District Court concluded on summary judgment. The plaintiff's argument confuses and conflates the defendants' action taken against him because of his speech about race with action taken because of his race.

The defendants claim protection from city liability under *Monell v. Department of Social Serv.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and from personal liability under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The District Court has had no occasion to consider these affirmative defenses with respect to the First Amendment claim. We express no opinion as to the proper disposition of these defenses. The one viable cause of action proved by plaintiff is his First Amendment claim. On remand the District Court should consider and decide any affirmative defenses raised in the case before dealing with the remedy for the First Amendment violation discussed in Part II of this opinion.

Accordingly, it is so ordered.