69 F.3d 321
 95 Cal. Daily Op. Serv. 8316, 95 Daily Journal
D.A.R. 14,415
Douglas CLEMENTS; Sue Clements, Plaintiffs-Appellants,
v.
AIRPORT AUTHORITY OF WASHOE COUNTY; Robert White,
individually and as Executive Director of the Airport
Authority of Washoe County; Board of Trustees of the
Airport Authority of Washoe County, Defendants-Appellees.
 No. 93-16693.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 16, 1995.
Decided Oct. 26, 1995.
 
 Lynn G. Pierce, Reno, NV, for plaintiffs-appellants.
 John A. Aberasturi (argued), Erickson, Thorpe & Swainston, Reno, NV, for defendants-appellees.
 Appeal from the United States District Court for the District of Nevada.
 Before: FLETCHER, REINHARDT, and NOONAN, Circuit Judges.
 REINHARDT, Circuit Judge:
 
 
 1
 Douglas and Sue Clements, former employees of the Airport Authority of Washoe County, filed this federal action under Sec. 1983 alleging that their terminations violated the Due Process guarantee of the 14th Amendment and were in retaliation for First Amendment protected whistle-blowing activity. They also asserted ancillary state law claims. The district court granted summary judgment to the defendants, and the Clementses appeal.
 
 I. Factual and Procedural Background
 
 2
 Douglas and Sue Clements were employees of the Airport Authority of Washoe County (Airport Authority).[1] Douglas Clements was Chief of Planning, Engineering and Maintenance, and Sue Clements was Property Management Analyst. The Clementses' positions were eliminated pursuant to the implementation of a reorganization plan developed by the Airport Authority's Executive Director Robert White. The Clementses contend that their positions were eliminated in retaliation for their whistle-blowing activities. They assert that their terminations constitute a denial of procedural due process and an infringement of their First Amendment rights.
 
 
 3
 The whistle-blowing activities at issue here occurred under the tenure of the Airport Authority's former Executive Director, Vernon Troupe. Troupe resigned following allegations of financial impropriety. Both Douglas and Sue Clements were involved in reporting Troupe's alleged indiscretions, and both provided information to Board members regarding Troupe's activities. Not all Board members were pleased with the Clementses' efforts to expose fraud within the Airport Authority. At least one told Sue Clements, prior to Troupe's resignation, that if she was unhappy she should seek alternative employment rather than make waves.
 
 
 4
 A few months after Troupe's resignation in early 1988, Robert White was hired as the new executive director. Shortly after his appointment, White developed a reorganization plan for the Airport Authority. After substantive modifications, this plan was adopted by the Board in April, 1989. Prior to the plan's adoption, the Board held public hearings to discuss the proposed reorganization. Douglas Clements made an appearance. Sue Clements did not.
 
 
 5
 There were four employees who made reports to Board members which led to Vernon Troupe's resignation, only three of whom were publicly identified. These three publicly identified employees were the only employees laid off in the reorganization. Douglas' position of Chief of Planning, Engineering and Maintenance was replaced with a position entitled Senior Engineer. Although he met all of the qualifications for this new position, Douglas was not offered it. Prior to reorganization, Sue Clements' property department had four professional positions. The reorganization reduced the number to three by creating positions with new titles, and Sue was the only properties professional laid off. The three remaining properties professionals were directly transferred into the new jobs, even though two of them had considerably less seniority than Sue.
 
 
 6
 Immediately after their terminations, Douglas and Sue filed individual grievances pursuant to the employee manual which embodies the Airport Authority's civil service system established pursuant to the laws of Nevada. In their respective grievance hearings, Douglas and Sue claimed that their layoffs were in retaliation for their participation in the Troupe affair, and that the layoffs violated the procedures established by the Airport Authority manual. After individual hearings, the grievance panels issued unanimous decisions finding that the Airport Authority had violated the manual when it failed to offer the Clementses new positions in lieu of layoff.[2] The panels determined that the Clementses should be offered the new positions with all the pay and benefits and no break in service. However, the panels declined to rule on the retaliatory discharge issue on the ground that the claim was beyond their scope and authority.
 
 
 7
 White, acting in his position as Executive Director, reversed the decisions of the grievance panels, finding that the panel decisions were inconsistent with personnel policy. It was White's position that neither of the Clementses was a civil servant and therefore neither was covered by the Airport Authority manual. After a hearing in 1989, the Board of Trustees adopted White's position. The Clementses filed a petition for judicial review in the Nevada state district court in October, 1989, pursuant to the Nevada Administrative Procedures Act. While the petition for judicial review was pending in state district court, the Clementses commenced this federal action in the federal district court for Nevada on April 12, 1991.
 
 
 8
 In December, 1991, the Nevada state district court issued its decision. First, it noted that its review was limited by the Nevada APA to an examination of the decision of the Board of Trustees, and that its function was to determine whether the Board's decision was arbitrary, capricious, or unsupported by substantial evidence. Under this standard, the court ruled in favor of the Airport Authority, finding that the Board's decision was supported by substantial evidence. The court refused to address the Clementses' arguments regarding retaliation reasoning that "[t]his is an issue not addressed in the Board of Trustees' decision and, thus, not an issue properly before this Court at this time." That decision was appealed to the Nevada Supreme Court on January 28, 1992. After oral argument in the Nevada Supreme Court, but before that court issued a decision, on August 5, 1993, the federal district court granted summary judgment for all defendants on the basis of a lack of material issue of disputed fact as to any essential element of the Clementses' claims. This appeal followed.
 
 
 9
 At the time of oral argument in this court on March 16, 1995, the Nevada Supreme Court had yet to issue a decision despite the passage of three years. While this case was under submission in this court, the Nevada Supreme Court issued a divided opinion affirming in part and reversing in part the state district court's denial of the petition for judicial review. The court affirmed the decision that Douglas was not a civil servant. It reversed the judgment as to Sue, finding that she was covered by the Airport Authority's civil service system, and ordered her reinstated with back-pay. We review de novo the decision of the federal district court granting summary judgment, and reverse in substantial part.
 
 
 10
 II. Preclusive Effect of the State Court Proceedings
 
 
 11
 Federal courts must give the same preclusive effect to state court judgments that those judgments would be given in that state's own courts. 28 U.S.C. Sec. 1738. See also Kremer v. Chemical Construction Corp., 456 U.S. 461, 465, 102 S.Ct. 1883, 1889, 72 L.Ed.2d 262 (1982). Although different preclusion rules apply in some circumstances to unreviewed findings of administrative proceedings, see Miller v. County of Santa Cruz, 39 F.3d 1030 (9th Cir.1994); McInnes v. California, 943 F.2d 1088 (9th Cir.1991), section 1738 by its own terms applies when administrative findings have been reviewed by state courts of general jurisdiction. Id. See also Eilrich v. Remas, 839 F.2d 630, 632 (9th Cir.1988) (federal courts must give preclusive effect to state court reviewed administrative determinations). Here, there are written decisions by the Board of Trustees containing findings of facts and conclusions of law. These decisions were reviewed by the Nevada district court which issued its own written decision containing factual findings and conclusions of law affirming the Board's decision as supported by substantial evidence. This latter decision was in turn reviewed by the Nevada Supreme Court which partially affirmed and partially reversed. Thus, we must address the question of the preclusive effect to be given to the state proceedings.
 
 
 12
 A. Supplemental Briefing on the Prior litigation
 
 
 13
 As described above, the Clementses initially sought review of their employment terminations through the Airport Authority's administrative grievance process, and when this ultimately produced an adverse decision, the couple petitioned for judicial review under the Nevada APA in state district court. By the time this case reached our court on appeal from summary judgment in federal district court, the Nevada state district court had issued a decision denying the Clementses' petition for review, and an appeal from that decision was pending in the Nevada Supreme Court. The initial state district court decision had been issued prior to the federal district court decision.
 
 
 14
 At first glance, the question whether the Clementses had a property interest in their employment for purposes of their Due Process claims seemed intimately connected to the question whether the Clementses were protected by the Airport Authority's somewhat complicated civil service system. Although the state proceedings did not adjudicate the constitutional claims, their resolution of the civil service claims appeared to provide an authoritative construction of the Airport Authority's civil service regulations, and appeared to answer the questions whether the Clementses' jobs were covered by the system and whether the requisite civil service procedures had been followed. Despite the apparent overlap of issues, there was a complete absence of any discussion of the potential preclusive effect of either the state administrative proceedings or the state district court decision in the proceedings below. No mention of preclusion appeared in either the federal district court decision or any of the initial briefs filed in this court. Accordingly, we requested supplemental briefing on this question.[3]
 
 
 15
 In the first set of supplemental briefs, only one cursory sentence on the final page of the defendants' brief suggested that the doctrine of claim preclusion might be applicable to this case. The remainder of the brief presented extensive arguments as to the issue preclusive effect that should be given to the state court proceedings. The plaintiffs' supplemental brief was similarly restricted to a discussion of issue preclusion.
 
 
 16
 Two months after we heard oral argument, the Nevada Supreme Court issued its long awaited opinion. Shortly thereafter, we again requested supplemental briefing; this time on the effect, if any, of the Nevada Supreme Court's decision on this federal action. It was in response to this final request for additional briefing that the defendants elected to assert an argument that the entire federal action is barred by the doctrine of claim preclusion.
 
 B. Claim Preclusion
 
 17
 Claim preclusion is a broad doctrine that bars bringing claims that were previously litigated as well as some claims that were never before adjudicated. Assuming the basic requirements of claim preclusion are met, certain unlitigated claims merge with the prior judgment in the case. This federal action contains claims that are completely distinct from those originally brought in the state court when the Clementses sought review of the administrative agency proceedings. These distinct claims (e.g. the retaliatory discharge claim) have never been adjudicated. It is these unlitigated claims that the defendants now assert are forever barred.
 
 
 18
 The defendants present some facially valid arguments regarding the applicability of claim preclusion doctrine to the present case. Generally, a state court judgment has the same preclusive effect in federal court as that judgment would have in the courts of the rendering state. Kremer, 456 U.S. at 465, 102 S.Ct. at 1889. This rule applies in a federal Sec. 1983 civil rights action and includes both principles of claim preclusion and issue preclusion. See Migra v. Warren City School District, 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). The primary exception to this general rule is that we do not give preclusive effect to judgments rendered in proceedings that fail to comply with the minimum standards of due process. In other words, the party against whom preclusion is urged must have had a "full and fair opportunity" to litigate his claim. See Kremer, 456 U.S. at 480-82, 102 S.Ct. at 1897-98. Thus, in the ordinary case, so long as due process was provided, we would look to the law of Nevada to determine the preclusive effect to give to the prior judgment here.[4] However, this is not the ordinary case.
 
 
 19
 There is another important exception to the general rule regarding the preclusive effect of state court judgments in federal court which controls the outcome of the issue here--waiver. Claim preclusion is an affirmative defense which may be deemed waived if not raised in the pleadings. Kern Oil v. Tenneco, 840 F.2d 730, 734-35 (9th Cir.1988). Moreover, the failure of the defendant to object to the prosecution of dual proceedings while both proceedings are pending also constitutes waiver. Id. See also Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1072-73 (3d Cir.1990) (defendant acquiesced to reservation of federal claim in state proceedings by failing to object); Calderon Rosado v. General Electric, 805 F.2d 1085 (1st Cir.1986) (court refused to apply claim preclusion because defendant acquiesced to splitting of claim when he failed to object or complain while the two actions were pending); Restatement (Second) Judgments Sec. 26(1)(a) (1982).[5] A main purpose behind the rule preventing claim splitting is "to protect the defendant from being harassed by repetitive actions based on the same claim." Restatement (Second) Judgments, Sec. 26 comment a. Many commentators reason that where a defendant acquiesces in the split, the rule should be inapplicable. Id.[6] We agree.
 
 
 20
 After reviewing the entire record in this federal action, we conclude that these principles of waiver should be applied to the defendants here. Although the defendants list several affirmative defenses in their responsive pleadings, the defense of claim preclusion is not among them. Moreover, the record shows that at no time did the defendants raise any such issue in the district court, nor in the brief originally filed in this court.[7] Similarly, they never objected to the splitting of any claim or to the prosecution of the two cases at the same time in the state and federal courts. Although the defendants finally elected to assert claim preclusion in the supplemental briefs filed three months after oral argument, we nonetheless deem that they have waived their right to do so.
 
 
 21
 Allowing the defendants to assert claim preclusion at this late stage would work a substantial injustice on the plaintiffs. At the time this federal action commenced, the petition for judicial review was still pending in the state district court. If the defendants had asserted their defense at that time, either by formally objecting to the dual proceedings through a motion to dismiss or by asserting the defense in their responsive pleadings, the plaintiffs would have had timely notice of the defendants claim and would have been able to take appropriate action in the state court proceedings (e.g. by attempting to amend the petition for judicial review to include the claims raised in the Sec. 1983 action). Rather than asserting the defense when timely, the defendants have waited until several years after the original federal complaint was filed. Under any generous standard of judicial discretion, this is far too late; and thus, we decline to recognize the defendants' belated assertion of this defense.[8] We hold that the defendants have waived any defense premised on claim preclusion in this federal action.
 
 C. Issue Preclusion
 
 22
 The principles of waiver that apply to claim preclusion defenses, also apply to issue preclusion. As we have the ability to overlook waiver and raise the res judicata issue sua sponte we may do so with respect to issue preclusion. Here, while we decline to recognize the defendants' untimely claim preclusion defense, we conclude that the considerations and concerns that compel that decision are not present with respect to issue preclusion.
 
 
 23
 Preclusion doctrine encompasses vindication of both public and private interests. The private values protected include shielding litigants from the burden of re-litigating identical issues with the same party, and vindicating private parties' interest in repose. The public interests served include avoiding inconsistent results and preserving judicial economy. See 18 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction Sec. 4403 at 11-18.
 
 
 24
 The relative weights of these public and private interests vary depending upon the type of preclusion at stake. For example, the "most purely public purpose" served by preclusion rules is that of "preserving the acceptability of judicial dispute resolution against the corrosive disrespect that would follow if the same matter were twice litigated to inconsistent results." Id. at 12. Vindication of this public interest is at its zenith in the realm of issue preclusion. It is the failure to adhere closely to basic issue preclusion principles that is most likely to lead directly to the inconsistent results that tend to undermine confidence in the judicial process. In contrast, the broader doctrine of claim preclusion, which bars the litigation of issues never before tried, has at its fundamental base the vindication of private litigants' interest in repose.
 
 
 25
 In resolving the question of claim preclusion, we found countervailing private interests that led us to apply strictly fundamental principles of waiver--the failure to hold the defendants to their waiver would subject the plaintiffs to gross prejudice. However, no such countervailing interests arise with respect to issue preclusion in this case. In issue preclusion, the only litigation barred is the re-litigation of an issue that has been actually litigated and necessarily decided.[9] Where the plaintiffs have had a full and fair opportunity to actually litigate the issue and did in fact litigate it, they can not ordinarily be prejudiced by subsequently being held to the prior determination. Moreover, the public interest would be greatly advanced by the application of issue preclusion here. It would avoid inconsistent results and would assist in the conservation of our judicial resources. Accordingly, despite the defendants' failure to raise the issue preclusion defense in a timely manner, we will nonetheless apply the doctrine in this case.
 
 
 26
 Thus, to the extent that issues regarding the Clementses' employment status were resolved in the state court litigation, relitigation of those issues in federal court is precluded. While this conclusion benefits Sue, it has a harmful effect on some of Douglas' claims. Recognizing this fact, the Clementses argue that while we should give preclusive effect to those issues which benefit Sue, we should not apply issue preclusion with respect to matters decided adversely to Douglas. They base their argument on the contention that the administrative proceedings took place in a biased and partial forum, and for this reason, they say, Douglas has never had a full and fair opportunity to litigate his claims.
 
 
 27
 Unfortunately for the Clementses, any bias or shortcomings that existed in the administrative process did not affect the outcome of the issue that was decided adversely to Douglas. The determination to which we give preclusive effect here is the Nevada Supreme Court's ruling that Douglas was an at-will employee and that he was not covered by the Airport Authority's civil service system. The Nevada Supreme Court decided the issue of Douglas' employment status as a matter of legal interpretation and expressly noted that it would reach the same decision whether or not it gave deference to the prior agency determinations. It determined as a matter of law that Douglas was a department head who served at the pleasure of the Executive Director, and who was outside the civil service coverage of the manual. Because the determination to which we give preclusive effect does not rest on deference to the administrative findings but rather involved a pure question of law, the issue of alleged bias did not color the outcome of the state court proceedings.[10]
 
 III. Due Process Claims
 
 28
 The Clementses assert that they were denied their property interests in their employment without due process of law. If true, they would be entitled to relief under Sec. 1983. This Due Process analysis involves a two-step process. First, we must determine whether the Clementses had a protected property interest in their continued employment. Second, we must determine whether, in being deprived of this interest, they received all the process that was due. The district court granted summary judgment against the Clementses on the grounds that they did not have a protected property interest, and even if they did, procedural due process requirements had been satisfied. We affirm this judgment as it applies to Douglas, but we reverse as to Sue.
 
 
 29
 A. Issue Preclusion Applied: Property Interests
 
 
 30
 In order to establish a Due Process claim, the plaintiffs first must show that they had a protected property interest in their jobs. We look to state law to determine whether a protected property interest exists. See, e.g., Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The Clementses premise their claim of a protected property interest on two possible bases: 1) that they were civil servants rather than at-will employees; and 2) that the employee manual was an employment contract creating a presumption of continued employment.[11]
 
 
 31
 Under Nevada law, the issue of the Clementses' civil service status is clearly precluded by the state court judgment. Whether the Clementses were covered by the civil service system was the heart of state court dispute. The Nevada Supreme Court determined that Sue Clements was a civil servant while Douglas Clements was not. The court also concluded that Douglas Clements was an at-will employee. These determinations represents a final resolution of the Douglas and Sue's employment status and relitigation of the issues is precluded.
 
 
 32
 Because the state court determined that Sue Clements was a civil servant, she had a protected property interest in her job for purposes of asserting a Due Process claim. See Walker v. City of Berkeley, 951 F.2d 182, 183 (9th Cir.1991). Conversely, the court's determination that Douglas was an at-will employee negates the existence of a property interest in his employment. See Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Douglas's claim that the manual created a presumption of continued employment is necessarily inconsistent with the court's determination.[12] Thus, only Sue has a viable due process claim. Accordingly, we now turn to the next step of our analysis to determine whether she received all the process she was due.
 
 
 33
 B. Was "Due Process" received?
 
 
 34
 It is well settled that "the root requirement of the Due Process Clause [is] that an individual be given an opportunity for a hearing before he is deprived of any significant property interest." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985) (internal citations and quotations omitted). Although the pre-termination hearing need not be elaborate, "some kind of hearing" must be afforded the employee prior to termination. Id. The essential requirements of this pre-termination process are notice and an opportunity to respond. Id., 470 U.S. at 544-45, 105 S.Ct. at 1495. See also Los Angeles Police Protective League v. Gates, 995 F.2d 1469, 1475-76 (9th Cir.1993); Wheaton v. Webb-Petett, 931 F.2d 613, 617 (9th Cir.1991).
 
 
 35
 The Board contends that these simple requirements were met by the public hearings on the reorganization. They assert that these hearings provided Sue Clements with notice of the proposed eliminations and that she had opportunities to present her views but declined to do so. Although the Board invokes the magical phrases "notice" and "opportunity to respond," the pre-termination process provided here appears to fall far short of that required by Loudermill. The public hearings to which the Board points apparently gave notice only that certain positions would be eliminated and that others would be created, and did not specify which particular individuals would be terminated. Moreover, the discussions at the hearings appear to have suggested that the layoff provisions in the manual would be followed. In view of Susan's seniority in the properties department, it appears that the hearings did not provide her with notice that she was in danger of being laid off. Nor, it would appear, did they provide her with an opportunity to respond and to make arguments as to why she had the right to fill one of the newly created positions rather than being terminated. Thus, the procedure followed here appears not to have fulfilled the purpose of the requisite pretermination hearing.[13]
 
 
 36
 Despite the apparent inadequacy of the pre-termination process, the defendants urge that the numerous post-termination hearings provided Sue with all the process she was due. They are incorrect. In the context of process due a terminated public employee, a full post-deprivation hearing does not substitute for the required pre-termination hearing. See L.A. Police Protective League, 995 F.2d at 1475-76. Indeed, Loudermill itself reveals that post-termination administrative hearings, even if followed by judicial review, are ordinarily insufficient standing alone to satisfy procedural due process in the public employee context. 470 U.S. at 544-45, 105 S.Ct. at 1495. Although the nature of subsequent proceedings may lessen the amount of process that the state must provide pre-termination, subsequent proceedings cannot serve to eliminate the essential requirement of a pre-termination notice and opportunity to respond.
 
 
 37
 Although the denial of a pre-termination hearing is a constitutional violation sufficient to support damages, cf. Knudson v. City of Ellensburg, 832 F.2d 1142, 1149 (9th Cir.1987),[14] we must also independently assess the adequacy of the post-termination proceedings. For not only is such an assessment usually required to determine the necessary scope of pre-termination procedures, but the inadequacy of post-termination process may itself be the source of a distinct due process violation. Loudermill, 470 U.S. at 547 n. 12, 105 S.Ct. at 1496 n. 12. Sue argues that the post-termination proceedings provided her were constitutionally infirm. She asserts that the post-termination process was flawed because it was infected with bias at the administrative level when Executive Director White set aside the grievance panel decisions, and the Board affirmed the director's actions. Sue alleges that these actors were biased because they harbored malice towards her stemming from her prior whistleblowing activities. If Sue's allegations are true, then she has stated a valid due process claim premised on the flawed post-deprivation procedures.
 
 
 38
 A biased proceeding is not a procedurally adequate one. At a minimum, Due Process requires a hearing before an impartial tribunal. Ward v. Village of Monroeville, 409 U.S. 57, 59-60, 93 S.Ct. 80, 83, 34 L.Ed.2d 267 (1972). This impartial tribunal requirement applies in both civil and criminal cases. Indeed, the requirement that proceedings which adjudicate individuals' interests in life, liberty, or property be free from bias and partiality has been "jealously guarded." Marshall v. Jerrico, 446 U.S. 238, 241-42, 100 S.Ct. 1610, 1613, 64 L.Ed.2d 182 (1980). Thus, this neutrality principle has been applied to a variety of settings, including administrative adjudications, in order to protect the "independent constitutional interest in fair adjudicative procedure." Id. at 241-42 n. 2, 100 S.Ct. at 1613 n. 2. And, it has been invoked in the context of post-termination administrative proceedings. See Walker v. City of Berkeley, 951 F.2d 182, 184 (9th Cir.1991) (failure to provide impartial decisionmaker at the post-termination hearing constitutes constitutional error).
 
 
 39
 Moreover, any bias in the administrative process in Sue's case was not "cured" by the subsequent judicial review in state court. Generally, an adjudication that is tainted by bias can not be constitutionally redeemed by review in an unbiased tribunal.[15] See Ward, 409 U.S. 57, 93 S.Ct. 80.
 
 
 40
 In Ward, the Court reversed a defendant's conviction of two traffic offenses because he was denied a trial in an impartial tribunal when he was tried before the mayor who was also responsible for village finances and the village budget was substantially funded through fines obtained through the mayor's court. The Court expressly rejected the village's argument that any unfairness in the mayor's court could be corrected on appeal and trial de novo in the County Court of Common Pleas. The Court stated:
 
 
 41
 Nor, in any event, may the State's trial court procedure be deemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication. Petitioner is entitled to a neutral and detached judge in the first instance.
 
 
 42
 Id. at 61-62, 93 S.Ct. at 84.
 
 
 43
 Ward holds that subsequent state court procedures, even if they include de novo review, can not "cure" bias in the initial adjudication.[16] We think that this principle applies regardless of whether a petitioner has been convicted or acquitted in the subsequently unbiased hearing, or whether a petitioner ultimately regains or loses his job. Obtaining full relief on the underlying substantive claim does not remedy the initial procedural injury. The right to procedural due process is "absolute," and "the law recognizes the importance to organized society that those rights be scrupulously observed." Carey v. Piphus, 435 U.S. 247, 266-67, 98 S.Ct. 1042, 1054, 55 L.Ed.2d 252 (1978). Thus, the "absolute" right to adequate procedures stands independent from the ultimate outcome of the hearing.[17] See Carey, 435 U.S. at 266-67, 98 S.Ct. at 1054. See also Knudson, 832 F.2d at 1148-49 (denial of a required pre-termination hearing is always actionable, even where an adequate post-deprivation hearing was provided and even where the deprivation itself was justified).
 
 
 44
 Sue asserts actual bias in the administrative tribunal and she points to facts in support of her assertions. These assertions raise a material issue of fact as to the adequacy of the post-termination proceedings. Because the record suggests that Sue was not provided with a constitutionally required pre-termination hearing, and because the record also makes it clear that the post-deprivation process may have been flawed, we reverse the grant of summary judgment on Sue's due process claims.
 
 
 45
 IV. First Amendment-Retaliatory Discharge Claim
 
 
 46
 The standard for evaluating a First Amendment retaliation claim was established in Mt. Healthy City School Dist. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). See Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir.1989). First, the plaintiff must show that his protected conduct was a substantial or motivating factor in the defendant's decision. Then, the burden shifts to the defendant to demonstrate that the same decision would have been made in the absence of the protected conduct. Id.
 
 
 47
 In granting the defendants' summary judgment motion, the district court determined that the Clementses did not have an actionable First Amendment claim for retaliatory discharge. Relying on the affidavit of Robert White, the court reasoned that the Clementses' allegations of retaliation were unsupported. White's affidavit states that, prior to the reorganization, he had no knowledge regarding the Clementses' role in the Troupe incident. White asserted that he first learned of the plaintiffs' involvement at the grievance hearings held after their layoffs. Further, White stated that the purpose of the reorganization was to improve the quality and efficiency of Airport Authority operations. In granting summary judgment, the court determined that the plaintiffs had presented no evidence to counter White's affidavit.
 
 
 48
 This conclusion is simply wrong. Contrary to the district court's statement, the plaintiffs did present evidence refuting White's affidavit. The Clementses presented the transcripts of the grievance panels proceedings and the deposition of Robert Mall, Sue Clements' direct supervisor. Viewing those transcripts and the inferences therefrom in the light most favorable to plaintiff, as we must for purposes of summary judgment, the Mall testimony contradicts the White affidavit: it suggests that White was well aware of the Clementses' previous problems with Vernon Troupe.[18] Moreover, the Mall testimony suggests that the reorganization targeted Sue Clements rather than the position she held.
 
 
 49
 Furthermore, the plaintiffs point to several facts from which a fact finder could infer a retaliatory motive. Cf. Soranno's, 874 F.2d at 1315. The testimony at the grievance hearing shows that there was little difference between the positions formerly held by Douglas and Sue and the new positions created pursuant to the reorganization. There was also testimony as to Douglas's and Sue's high quality performance for the Airport Authority--thus suggesting no reason to deviate from established seniority layoff/bumping procedures. Finally, there was testimony that an individual Board member, at the time of the Troupe affair, had implicitly threatened Sue Clements. This evidence and the permissible inferences which can be drawn from it raises a material issue of fact as to whether Douglas's and Sue's whistle-blowing was a substantial factor in the elimination of their jobs.[19] Whether constitutionally protected activity played a substantial factor in the Clementses' termination presents a sufficient jury question to defeat summary judgment. See Schwartzman v. Valenzuela, 846 F.2d 1209, 1212 (9th Cir.1988); Soranno's, 874 F.2d at 1315. Accordingly, we reverse the district court's grant of summary judgment on this claim.
 
 V. State Law Claims
 
 50
 Both parties assert a variety of claims and defenses under state law. The Clementses assert claims for tortious discharge, intentional infliction of emotional distress, and breach of contract. There are two types of tortious discharge claims under Nevada law: bad faith discharge and discharge in violation of public policy. The bad faith discharge tort is committed when "an employer, acting in bad faith, discharges an employee who has established contractual rights of continued employment and who has developed a relationship of trust, reliance and dependency with the employer ". D'Angelo, 819 P.2d at 211. An at-will employee can not bring a bad faith discharge tort claim. Brooks, 959 F.2d at 765.
 
 
 51
 As discussed above, the state court judgment resolves the issue of Douglas' contractual rights of continued employment. He had none. As for Sue, she fails to assert sufficient facts to establish the claim. Under Nevada law, a bad-faith discharge claim is available in only a "narrow class of cases in which, because of the relationship of employer to employee, the offending conduct 'goes well beyond the bounds of ordinary liability for breach of contract.' " D'Angelo, 819 P.2d at 215. Such a special relationship must be analogous to the kind of " 'special reliance,' trust and dependency that is present in insurance cases." Id. The Nevada court looks for facts such as promise of employment "until retirement," lengthy duration of employment, and termination characterized by "deception," "perfidy," and "betrayal." Id. Sue has pointed to no facts which give rise to the inference that such a special relationship existed. Something beyond the ordinary civil service relationship must be present. Accordingly, summary judgment on this claim for the Airport Authority was appropriate.
 
 
 52
 A tortious discharge may also arise "when an employer dismisses an employee in retaliation for the employee's doing of acts which are consistent with or supportive of sound public policy and the common good." D'Angelo, 819 P.2d at 216. Moreover, this tort stands independent of any employment contract, and thus may be brought by an at-will employee. Id. Discharging an employee for reporting the financial wrongdoing of public officials would violate "sound public policy." As discussed above, the plaintiffs raise material issues of fact as to whether they were discharged in retaliation for reporting the prior executive director's improper use of public funds. This is sufficient to defeat summary judgment on this claim.
 
 
 53
 Summary judgment on the remaining emotional distress and breach of contract claims was appropriate. Under this circuit's construction of Nevada law, there is no "cause of action for intentional infliction of emotional distress in the employment termination context." Brooks, 959 F.2d at 766. Further, the issues necessary to support the breach of contract claim are identical to the issues resolved by the state court judgment on the Clementses' civil service claim. Accordingly, Douglas is precluded from re-litigating the issues. In Sue's case, any employment contract that Sue had was coextensive with her civil service claim. In obtaining full recovery on that claim (reinstatement and backpay), she has also obtained full relief on her breach of contract claim. Thus, we affirm the grant of summary judgment in favor of the Airport Authority on these claims.
 
 
 54
 Finally, the defendants raise several state law defenses, only one of which has merit--that punitive damages are unavailable.[20] NRS 41.035 states that punitive damages can not be awarded in tort actions against an officer or employee of any political subdivision or against a political subdivision for acts or omissions arising out of the scope of public duties. Under NRS 41.0305, airport authorities are classified as political subdivisions. Accordingly, punitive damages are unavailable on the Clementses' state law tort claims. However, such damages are available under certain circumstances in Sec. 1983 claims. See Carey, 435 U.S. at 257-58 n. 11, 98 S.Ct. at 1049 n. 11. We do not prejudge those circumstances or the validity of any properly raised defenses that may be available including any defense that the airport authority is a municipality or an agency of the state. Therefore, we do not strike the punitive damage claim in its entirety.
 
 Conclusion
 
 55
 By waiting several years until after the dual state and federal proceedings began and by failing to plead claim preclusion as an affirmative defense in their responsive pleadings, the defendants have waived any claim preclusion defense to this action. Nevertheless, in the interest of judicial economy and in avoiding inconsistent judicial pronouncements, we apply issue preclusion principles to this action. Because the state court determined that Douglas was an at-will employee, we AFFIRM the grant of summary judgment against him as to his Due Process claim. However, because the state court held that Sue was entitled to civil service protection, we REVERSE the summary judgment on Sue's Due Process claim.
 
 
 56
 Furthermore, we REVERSE the summary judgments as to both Douglas and Sue on their First Amendment claims because they have raised a material issue of disputed fact as to the knowledge of the Executive Director regarding their prior whistle-blowing activities and as to the motivation for their terminations. For the same reason, we also REVERSE the summary judgment as to the public policy discharge tort for both plaintiffs. We AFFIRM the grant of summary judgment as to all other state law claims. On remand, we instruct the district court to strike the request for punitive damages on the state tort claims. The defendants' remaining state law defenses are without merit. Costs on appeal are awarded to plaintiffs.
 
 
 57
 REVERSED IN PART, AFFIRMED IN PART, and REMANDED.
 
 
 
 [1]
 The Airport Authority of Washoe County was created by the Nevada legislature in 1977 to operate and finance the regional airport in the Reno area. See Airport Authority Act for Washoe County, Ch. 474, Stats.1977. The Airport Authority is considered a public employer under the laws of Nevada. Id. at Sec. 28
 
 
 [2]
 Pertinent provisions of the manual state:
 When necessary to reduce the number of employees in any job classification, it is the policy of the Airport Authority whenever possible to attempt to minimize layoffs by readjustment of personnel through transfer, if qualified, to other open positions within the Authority.
 It is further policy that whenever layoffs are necessary, temporary and probationary employees in that job classification shall be laid off before permanent employees. Permanent employees shall be laid off in inverse order of their length of service by job classification.
 
 
 [3]
 Inter alia, we specifically asked whether the state district court decision had any "collateral estoppel effect on the issue of Douglas Clements' 'at will' employment status, Sue Clements' civil service status, and the property interests the appellants had in their jobs ..."
 
 
 [4]
 Although Nevada preclusion law is sparse and there is no case directly on point, the available cases show that Nevada courts have taken a somewhat narrower approach to claim preclusion than the most expansive "transactional" approach adopted by some jurisdictions and advocated by the Second Restatement
 Under Nevada law, in order for a subsequent suit to be barred under claim preclusion, the subsequent suit and the first suit must arise from the same cause of action. See Round Hill General Improvement District v. B-Neva, Inc., 96 Nev. 181, 606 P.2d 176 (1980); Firsching v. Ferrara, 94 Nev. 252, 578 P.2d 321 (1978); Tomiyasu v. Golden, 81 Nev. 140, 400 P.2d 415 (1965). The Nevada test for identical causes of action is whether the sets of facts essential to maintain the two suits are the same. Firsching, 578 P.2d at 322.
 
 
 [5]
 This provision states:
 [The general rule against splitting claims] does not apply to extinguish the claim, and part or all of the claim subsists as a possible basis for a second action ... [where] [t]he parties have agreed in terms or in effect that the plaintiff may split his claim, or the defendant has acquiesced therein.
 Restatement (Second) Judgments Sec. 26(1)(a).
 
 
 [6]
 As the Restatement commentators explain:
 Where the plaintiff is simultaneously maintaining separate actions based upon parts of the same claim, and in neither action does the defendant make the objection that another action is pending based on the same claim, judgment in one of the actions does not preclude the plaintiff from proceeding and obtaining judgment in the other action. The failure of the defendant to object to the splitting of the plaintiff's claim is effective as an acquiescence in the splitting of the claim.
 Restatement (Second) Judgments Sec. 26, comment a.
 
 
 [7]
 Prior to the district court's grant of summary judgment and the appellate proceedings in this court, the Nevada district court issued a final judgment. However, at no time did the defendants attempt to assert preclusion based on this judgment even though they had the opportunity to do so
 In some jurisdictions, pendency of an appeal precludes a judgment from being considered "final" for purposes of preclusion doctrine. However, the general rule is that a judgment may be treated as final for purposes of preclusion notwithstanding the fact that it may be subject to reversal on appeal. See Restatement (Second) Judgments Sec. 13 and comment f, Sec. 16 and comment a. See also Denham v. Shellman Grain Elevator, 444 F.2d 1376 (5th Cir.1971) (interpreting Georgia law) ("according to the majority rule, an appeal from a judgment does not suspend the effect of the judgment as res judicata between the parties."); Crockett & Brown, P.A. v. Wilson, 314 Ark. 578, 864 S.W.2d 244, 246 (1993) ("finality for purposes of appeal is closely related to finality for purposes of res judicata"); Southwestern Elec. Power v. Martin, 844 S.W.2d 229, 236 (Tex.App.1992) ("judgment is final for purposes of issue and claim preclusion despite the taking of an appeal (except where the appeal is trial de novo)"); Hansen v. Haagensen, 178 N.W.2d 325 (Iowa 1970) (interpreting Minnesota law).
 Nevada appears to follow the general view--according finality to judgments notwithstanding opportunities to appeal. See Baker v. Leary, 70 Nev. 152, 261 P.2d 1013 (1953) (contrasting the Nevada and California rules).
 
 
 [8]
 Although we do not reach the issue as a basis for our decision, we note that the plaintiffs raise a legitimate argument that they "reserved" their federal claims in the state court proceedings. In circumstances where a federal court abstains (or could abstain) and sends the plaintiffs to state court, or where plaintiffs realize that abstention is likely and file a parallel action in state court, the plaintiffs may be able to preserve a federal forum for their federal claims by expressly reserving the issues in state court. See Bradley, 913 F.2d at 1071-72. See also England v. Louisiana State Bd. of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964)
 It appears that the plaintiffs may have attempted to utilize this procedure here by submitting a copy of their federal complaint to the state courts. Cf. Bradley, 913 F.2d at 1068. It further appears that the state court may have partially recognized and acquiesced in this reservation. Cf. Id. The Nevada Supreme Court noted in its decision:
 The issue of retaliatory firing was specifically contained in the federal district court complaint, and the record supports the state district court's determination that the retaliatory firing issue was not properly before it. It is clear from the record that Douglas and Susan elected to litigate the retaliatory firing issue in the federal court system.
 Clements v. AAWC, 111 Nev. 717, 896 P.2d 458, 462 (1995).
 
 
 [9]
 Under Nevada law, if an issue "was actually decided and necessary to the judgment in the earlier suit, its relitigation will be precluded." University of Nevada v. Tarkanian, 110 Nev. 581, 879 P.2d 1180, 1191 (1994). For issue preclusion to apply, the issue must have been "actually and necessarily litigated," and its actual adjudication must be clear from the record. Id
 
 
 [10]
 There is no contention that the content of the record was in any way shaped or affected by agency bias. In fact, the factual record was made before the grievance panels, which were concededly impartial and which ruled in favor of the Clementses
 
 
 [11]
 Under Nevada law, employment contracts are presumably terminable at will; however, "an employer may expressly or impliedly agree with an employee that employment is to be for an indefinite term and may be terminated only for cause or only in accordance with established policies or procedures." D'Angelo v. Gardner, 107 Nev. 704, 819 P.2d 206, 211 (1991). This latter type of agreement is called a contract of "continued employment." Id
 
 
 [12]
 An at-will employee may be terminated at will. In contrast, under a contract for continued employment, an employee can only be fired for cause or in accordance with specified policies or procedures. See D'Angelo, 819 P.2d at 211. These two employment statuses are mutually exclusive
 
 
 [13]
 In Loudermill, the Court explained this purpose as follows:
 The point is that where there is an entitlement, a prior hearing facilitates the consideration of whether a permissible course of action is also an appropriate one.... [Permitting the employee] to give his version of the events will provide a meaningful hedge against erroneous action.
 470 U.S. at 543 n. 8, 105 S.Ct. at 1494 n. 8.
 
 
 [14]
 In Knudson, a former police officer was improperly denied medical benefits, and the deprivation of this property occurred without benefit of the required pre-deprivation hearing. We held that the plaintiff was entitled to compensatory damages included damages for emotional distress. 832 F.2d at 1149
 In doing so, we noted that the denial of procedural due process supported a damage award regardless of whether the deprivation was justified. We concluded that where the procedures are constitutionally inadequate, but the property deprivation was justified, a plaintiff could recover nominal damages. Where the deprivation was unjustified, the plaintiff is entitled to full compensatory damages. Id.
 
 
 [15]
 A pre-termination hearing involves only notice and an opportunity to respond, and does not constitute an "adjudication." Thus, the decisionmaker in a pre-termination hearing need not be impartial, so long as an impartial decisionmaker is provided at the post-termination hearing. See Walker, 951 F.2d at 184
 
 
 [16]
 Our reading of Ward mirrors that of the Nevada Supreme Court. It has construed Ward as applying to the state's administrative proceedings and expressly concluded that even full review by the Nevada Supreme Court of non-impartial administrative adjudicatory proceedings would not satisfy due process. Matter of Ross, 99 Nev. 1, 656 P.2d 832, 839 (1983)
 
 
 [17]
 Relying on Meyers v. City of Cincinnati, 934 F.2d 726 (6th Cir.1991), the defendants argue that the state court judicial review procedures were sufficient to cure any defects in the administrative process, and accordingly, the entire post-termination process was adequate for Due Process purposes. In Meyers, the court held that the municipal civil service commission's erroneous refusal to hear plaintiff's claim did not constitute a due process violation where there was an adequate state judicial review process for the correction of errors by administrative agencies. 934 F.2d at 731. The court rested this conclusion on a Sixth Circuit requirement that "in a procedural due process case under section 1983, the plaintiff must attack the state's corrective procedure as well as the substantive wrong." 934 F.2d at 731 (quoting Vicory v. Walton, 721 F.2d 1062 (6th Cir.1983))
 However, the Sixth Circuit created this rule as an extension of Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), and we have already rejected such an extension of the Parratt doctrine. See Knudson, 832 F.2d at 1149. "We apply Parratt [ ] only when 'the state administrative machinery did not and could not have learned of the deprivation until after it occurred,' not when state officials acted pursuant to state policy and followed state procedures they believed proper." Id. at 1149. Thus, in Knudson, we held that where the deprivation at issue occurred pursuant to "deliberate and considered" decisionmaking, the deprivation does not fall within the Parratt doctrine.
 Because the reasoning in Meyers is inconsistent with our own precedent, and in our view, is also inconsistent with relevant Supreme Court authority, we decline to follow it here.
 
 
 [18]
 Robert Mall provided testimony as to conversations he had with Executive Director White prior to implementation of the reorganization. Pertinent portions of the transcript read as follows:
 Q When were you told that Sue Clements was being laid off in the reorganization?
 A My recollection is it was the afternoon of the caucus meeting which I think would have been April 4th.
 Q Okay. Who were you told by?
 A Bob White.
 Q Did you question the decision to lay off Sue Clements?
 A Not at the time.
 Q You questioned it later?
 A Yes.
 Q When was that?
 A That was Friday following the board meeting, that must have been the 7th of April.
 Q Okay.
 A And Mr. White came back and told me he was preparing the termination letters, and I--I asked him if he could spare me a few moments, I had some additional information that I would like him to look at.
 Q And what information was that?
 A There's a provision in the personnel manual on layoffs ... and that provision says that layoffs will be done in order of seniority, some such language, based on job classifications.
 [ ...]
 Q So when you brought this policy to Mr. White's attention, did you suggest that someone else should be laid off and not Sue.
 A Yes.
 Q And what was Mr. White's response?
 A He wanted to discuss it with some other people.
 Q Did he specify who he was going to discuss it with?
 A No, I don't think so.
 Q And that was on Friday morning. Did he get back to you regarding his discussion and decision on that matter?
 A In a sense he got back to me on his decision. When I returned from lunch Sue had gotten her termination letter.
 Q Okay. When you met with Mr. White to discuss this, did he ask you any question regarding Sue's qualifications for the job or Sue's competence in the job or anything of that nature?
 A I--I don't recall whether he did or not.
 Q Okay.
 A We did have a lengthy discussion.
 Q Okay. Did he ask you any other questions regarding Sue?
 A He did ask what the problem was between Sue and Verne Troup or what I knew about it or something to that effect.
 Q Okay. What--what is your opinion as to the reason Sue was laid off in this reorganization?
 A It's my belief that Sue was laid off as a vendetta with relation to Mr. Troup's departure.
 
 
 [19]
 This reading of the record finds support in the split decision of the Nevada Supreme Court. The majority refused to reach the retaliatory discharge issue on the ground that it was not before them. In his separate opinion, concurring in part and dissenting in part, Justice Springer made the following observations:
 The record tells me that Douglas was probably unjustly terminated and that Director White and his overly compliant board reorganized the entire Airport Authority just to get rid of Douglas because he was a threat to the status quo--he was a whistle-blower, who was calling attention to irregularities and illegalities on the part of the Airport Authority administration.
 Adv.Op. # 70--Springer, J. at p. 1.
 
 
 [20]
 Defendants also raise the following arguments: 1) the "Board of Trustees of Airport Authority of Washoe County" lacks the capacity to be sued; and 2) the Airport Authority is protected by governmental and legislative immunity
 Under NRS 12.105, the Clementses can sue the political subdivision of the Airport Authority without naming the individual members of its governing body in their representative capacity. The Clementses' complaint names both the "Airport Authority of Washoe County" and the "Board of Trustees of Airport Authority of Washoe County." To the extent that they were attempting to sue the Board in its representative capacity, naming both the Board and the "Airport Authority" was probably duplicative, but it was not fatal.
 NRS 41.031 immunizes state officers from suits based on the execution of a statute or regulation if the statute or regulation has not been declared invalid, and from suits based on the performance or nonperformance of a discretionary function. The Clementses are challenging the termination of their individual employment in violation of the laws of Nevada and the United States. This is not a challenge to a statute, regulation, or exercise of a discretionary function. Accordingly, this action falls outside the scope of NRS 41.032.